Now we are ready. This case is 22-3246 Davis v. PHK Staffing, and if you would enter your appearance and you may proceed. And I understand you're splitting your time with the Council for the EEOC, correct? That's correct. You may proceed. I'm Catherine Paulus. I'm here on behalf of Appellant Danielle Davis. May it please the Court. The crux of the issue in this case are actually two related issues. One, whether Danielle Davis was a qualified individual for purposes of the ADA, and two, whether her requested accommodation was reasonable, plausibly reasonable on its face. And the District Court, we contend, erred in determining that Ms. Davis was not a qualified individual for purposes of the ADA because the District Court concluded that reasonable and reliable attendance was an essential function of the position that she held at Hollywood Casino, and that she could not fulfill that essential function of her position, and thus was not a qualified individual ending the inquiry. Let me, so do you contest that it was an essential function of this job for her to have regular attendance? We contest that it was an essential function for her to have regular and reliable attendance in the way defined by Hollywood Casino, in a way that complies with their very strict no-fault attendance policy. And so, distinguishing there between regular and reliable attendance, we do not contest that she had to be physically present at her job in order, that was an essential function of her job. What we contest is whether the casino and their application of the no-fault attendance policy actually was applied consistently across the board. As we noted in the briefing, there were exceptions under that no-fault attendance policy. Well, the exceptions applied equally to disabled and abled employees, didn't they? So, it didn't matter if you were disabled or you had a disability or not, if you could take advantage of the grievance exception for death of a family member to go to a funeral, right? That's correct. So, how is that in some way problematic here? Why it's problematic here is because the condition, the disabling condition that Ms. Davis had, chronic asthma, it's a chronic condition that has periodic and unpredictable flare-ups, and that was her requested leave. And if you go to kind of the history of how that request for accommodation came about, she had, within a few days of being hired, during her orientation, she had inquired about the possibility of FMLA leave, knowing that there was a potential for her to have flare-ups of her asthma condition that would require her to be absent from work, either to leave work early or not be able to work that day. Was she told about the attendance policy before she was hired? I believe she was told during orientation she would have learned about it because she signed an acknowledgement form during that process. And did she disclose her potential disability to the casino before she was hired? I don't know the answer to that, Your Honor. I don't know if she had disclosed that before she was hired. I know that during the orientation process, she had inquired about FMLA leave when she was told she would not be eligible until she had worked for a year, what the eligibility requirements were. The HR generalist, Ms. Beck, had said, but we do have an ADA accommodations policy, and she had received accommodation paperwork within a week or so of being hired. You know, the core of this case, a lot of jobs have an in-person attendance requirement, maybe most jobs. And, you know, certainly you can't staff a gaming table without being there. And so the question really between the employee and the employer is, how do I accommodate anticipated absences because of a chronic illness? And I guess a couple of questions. One is a chronic illness like she has that is unpredictable and severe, is that a permanent condition that needs to be accommodated? Or is it a temporary condition? Because as I understand the record, it's basically a lifetime affliction for her, and that suggests that it's a permanent condition, although the effect on her job performance is variable. Correct, Your Honor. A permanent condition with temporary impairments, essentially. When there are flare-ups, when her condition is exacerbated, that's when she would need the time away or would actually need the accommodation. And it's undisputed that it's unpredictable. That's correct. And so the issue here, so when Ms. Davis had initially requested the accommodation paperwork, she decided that she thought she could do without it, and so had abandoned the process early on. But then in October of 2019, so she had been working about three months, her condition, as it can do, she experienced an increase in her symptoms. She missed two days of work due to asthma attacks, and at that time realized that she needed to read. Coming back to my question, the onset is unpredictable and variable. As I read the doctor's report or the record, an attack can last up to 21 days when she would be outside of the workplace, right? I mean, it could be a shorter or longer period, but the report said 14 to 21 days would be the definition of a temporary impairment, correct? I believe so in terms of when her symptoms were manifesting more strongly. But to be honest, the verification form itself is not a model of clarity. It was likely reasonable for Hollywood Casino to get additional information. Well, they tried, didn't they? I mean, repeatedly tried, and it was Dr. Russell who wouldn't respond. They tried with the same four questions and tried by phone and by fax, but we do note that those questions were never posed to Ms. Davis as part of the interactive process, and some of those she could have easily answered herself. There was not medical, I guess, training or expertise necessary to answer some of those questions, such as about the nebulizer and what it is and whether she could use it at work. The other questions about how frequently it would have occurred were never asked. The question posed that Ms. Beck later testified was the predicate, I guess, to asking those questions was, is this temporary or permanent? And so the question was never posed to Ms. Davis or to her medical provider, what is the anticipated frequency or duration of asthma attacks, how much leave would be needed? Those questions were never asked. Well, I believe Dr. Russell did give the information that Judge Timpkowitz has already mentioned, that an attack could last from 14 to 21 days. I believe that he referenced that in the context of when she was seeing him and when he completed that verification form based on when she had first reported the symptoms versus when he concluded that it was likely they would dissipate, but not necessarily saying how many days of leave she might need associated with that. But that's the best information they had, and I just sort of, an ultimate question is, is it reasonable to accommodate an employee that might miss work for three straight weeks an unknown number of times a year? But again, I don't think that the verification form and the questions that were asked in response to that were contemplating that possibility, nor do I think that was the actual accommodation that Ms. Davis was requesting. As she had stated, she was asking for FMLA and then basically trying to use an accommodation to bridge the gap until she would be eligible for FMLA. Where does she make it clear that she's asking for an accommodation? I think it's for the five months until she could qualify for FMLA. I mean, the actual language of what she wrote as her accommodation says nothing about that. It says she wants to have the prior points removed and that she wants to call in or leave early due to severe asthma attacks, that she will not be pointed or held against her. There's nothing here that I see that put Hollywood on notice that what she was asking for was accommodation for just until she qualified for FMLA. Well, you're correct. It's not in her handwritten form where she requested the accommodation, but it is in the history of her interactions with the HR generalist who was helping her with this accommodation and who was actually processing it, in that she had inquired about FMLA and then was told when she would not be eligible for that, that the company maintained an accommodations policy. And so, again, we also note that that question was never posted to her specifically for the duration or what the intention was for her request to leave. Counsel, when the district court started in on your presentation, you said that the district court found that she wasn't qualified because she couldn't be in attendance, essentially, which was an essential function of the job. But the district court alternatively ruled on the accommodation issue and relied heavily on the DeWitt case. That's correct, Jen. And why did the district court, why do you believe the district court erred in relying on DeWitt? At least that's what you argued in your brief. Yes, in the brief. Basically, it's saying that you don't have, as far as the retroactive request, now I'm talking about the retroactive request, the district court said you don't have to retroactively give someone leave who's committed a misconduct. And as I understood your argument in your brief, you thought that this doesn't equate to the misconduct in DeWitt. But in DeWitt, we extended the whole concept of misconduct to what we call performance standards, which would include attendance and the number of days that you were in attendance, essentially quantitative performance standards. And we specifically said that our holding wasn't limited to misconduct type. So if that's the case, I guess I don't understand why DeWitt, maybe not for the same reasons the district court cited it, but why doesn't it control your request for retroactive leave for the days she'd already missed? Well, the secondary argument that we made as to the application of DeWitt to this situation was we contend that the no-fault attendance policy was not a conduct standard that was uniformly applied. Because, again, if the strict compliance, strict adherence to the no-fault attendance policy was really going back to the essential functions of the job, then the fact that the company permitted bereavement leave, permitted leave for... Well, certainly it had a few exceptions like companies do. But for the most part, an employee who does not have a disability would have stood in the same shoes. And that's really what you look at is would an employee with a disability, or without a disability, I apologize. For instance, let's say an employee is at work, they don't have a disability, they develop the flu, and they have to leave. They're going to get points, right? Because they don't have a disability. But you were asking to accommodate this plaintiff because she has a disability, and that's what DeWitt would say you can't do. Well, with respect to that... Retroactively. Retroactively, yes. But I just note that the accommodation she requested had both a retroactive and a prospective component. So even if the retroactive... Right, I understand. ...is not reasonable. We've been talking about the prospective. Okay, thank you. I think I'm out of time. Your time's expired. Mr. Wickman, you can still have your five minutes. Thank you. Good morning, Your Honors, and may it please the Court, Stephen Winkleman with the Equal Employment Opportunity Commission. The central issue in this case concerns whether and when unplanned intermittent leave may serve as a reasonable accommodation under the ADA for chronic conditions like asthma. In holding that Davis' requests for prospective and retroactive intermittent leave were unreasonable as a matter of law, the District Court erred in several critical respects. First, contrary to the District Court's reasoning, in assessing whether an individual remains qualified with an accommodation of leave, the relevant inquiry is not whether regular and reliable attendance is an essential function. Instead, the appropriate inquiry is whether the requested leave would allow the employee sufficient time to recover from her condition such that she may attend work and perform essential job functions in the near future. Here, there is little dispute that intermittent leave had precisely that effect and allowed Davis to return to work almost immediately after each of her asthma attacks. Under these facts, a reasonable jury could find that Davis was a qualified individual with an accommodation of intermittent leave. Second, the District Court incorrectly held that retroactive leave is per se unreasonable under the ADA. As the Sixth Circuit explained in King, retroactive leave may be a reasonable accommodation at a minimum when the employee requests a short duration of leave and her employer's policies allow that type of leave. Here, Davis requested just two days of retroactive leave and she provided... What do you mean when you say the District Court said it was per se not available? Because the District Court did consider this DeWitt case as far as a retroactive leave and said when an employee has committed misconduct and this falls within that, our Tenth Circuit case law, and that's DeWitt, says if an employee who's not disabled would not be given retroactive leave, neither can the employee who's given leave. And we said in that case, as I mentioned to you, claims counsel that leave, and this was the EEOC's argument in that case, that leave includes performance, violation of performance standards as we have here. I'm sorry, misconduct includes. Includes performance standards. That's true. What's curious about DeWitt, Your Honor, is that an employer is also not required to prospectively excuse misconduct or poor performance. By contrast, employers can be required to. But I was focusing on retrospectively because you mentioned that you thought the District Court said it was per se not available and I didn't get that impression. I thought the District Court relied on DeWitt for its alternative ruling and DeWitt is our Tenth Circuit case law and so I think that does control here. Your Honor, it's true that what the District Court said is that retroactive leniency for misconduct is never required and it's true that DeWitt says that misconduct includes performance standards, but it did not involve specifically retroactive leave and at least as we've argued here, in the context of a point-based no-fault attendance policy, the distinction between prospective leave and retroactive leave collapses. As we explained under the EEOC's guidance, an employer must, absent undue hardship or alternative effective accommodations, provide additional leave as an accommodation for a no-fault attendance policy. Here, however, there would be no difference functionally between providing additional leave, for example, increasing the threshold, the terminable threshold, or excusing prior absences and removing the points. So again, the distinction between the retroactive and prospective leave in that situation simply collapses. Can you explain to me practically how this works The employer hires an employee. Hypothetically, that employee is going to work 100% of the work week subject to excused absences. In this case, you have an employee that, as I understand, for purposes of my hypothetical, an employee with a chronic disability is never going to reach that 100% threshold. The employer is faced with the prospect of having an employee for an essential function of the job, which is in person, that can never meet the base requirements of the employer. The leave accommodates the employee, but the employer never gets what it's bargaining for for an in-person employee for this type of job. I'm trying to square that with, and maybe that's a due hardship question, but tell me how the essential function doesn't block the claim in the first instance. Well, the first response to that question is this court's case law is very clear that when assessing leave as an accommodation, the relevant inquiry is whether the leave will allow them to perform the essential job functions and attend work in the future. It's not whether regular and reliable attendance is an essential function. Additionally, we're not suggesting that a employer needs to provide unlimited leave or allow the employee to accrue an unlimited number of absences. Under these circumstances, it might, facing a request like Davis's, her prospective request, I think, had two components. One was for the short-term duration of her immediate asthma flare-up, and the second portion was the long-term request going forward. Here, I think there are a couple different ways an employer faced with that type of request could respond. One would be to grant the short-term request and consider future requests on a case-by-case basis. It also could have set some limit on the number of additional absences it could forgive going forward, and I think that would have to be a circumstance-dependent analysis that's focused on the specific job duties that the person has and how disruptive unplanned absences are on the employer's operations. What do we do with the doctor's statement, which is all they had, which is that these flare-ups could last 14 to 21 days? Your Honor, the doctor's note said that this particular flare-up was expected to last 14 to 21 days. We haven't read from that that any future flare-ups would necessarily have resulted in that length. Moreover, it's important, I think, to recognize here that Davis suffered the first three of her four absences over a two-week period in October to November and then went another three-and-a-half months with apparently no further asthma-related absences. So the record here indicates that by the time Hollywood acted on the accommodation request, it was clear that Davis's absences were not frequent or burdensome. All right, counsel, thank you. Your time has expired. Let's hear from PHK. May it please the Court. Good morning, Your Honors. My name is Michael Powers. I'm from McManberger in St. Louis, and I represent Appellee PHK Staffing, LLC, which is doing business as Hollywood Casino at Kansas Speedway. So this is really Hollywood Casino for ease of discussion. Hollywood asserts that Judge Teeter's order is entirely correct and is consistent with the vast body of Tenth Circuit case law as to all of these issues presented, as well as the case law of essentially every other federal appellate circuit to have considered these issues. In all of the vast number of cases cited throughout these pleadings, there is no case that we are aware of at any federal court, let alone at any federal appellate court, that stands for the proposition that unlimited, unplanned, unexcused, intermittent absence is a reasonable accommodation or that a plaintiff, or sorry, rather an employee whose only suggested accommodation is unlimited by duration or number leaves without planning, without notice, is a qualified individual under the Americans with Disabilities Act. I believe that the District Court's order was quite clear and correct and relied correctly upon Tenth Circuit precedent in coming to the conclusion that this was not a reasonable accommodation request. It was not a plausibly reasonable accommodation request. And I would note that even at this late date, we have never been confronted with what a reasonable accommodation which would have allowed Ms. Davis to perform the essential functions of her position. The EEOC has taken the position with the benefit of hindsight of looking back and saying she only needed a certain number of days of absence. We did not have that benefit at the time we were presented with her request for whenever she was needed absence to take that absence. And we don't know what would have happened after she eventually separated from Hollywood. Ms. Davis... Wasn't it several months before you actually denied the request? Didn't you have two or three months in? I want to say November 1st was the date that the doctor's report said that she would be recovered from whatever that... That is correct. November 1st... But then wasn't it not until February that you terminated her? Well, she pointed out in February. She pointed out in February and it is true that... Pointed out meaning exceeded the point level... Correct, Your Honor. Sorry. She exceeded the allowed number of attendance points. We know that only a certain number of those attendance points were due to her medical condition. But I'm not sure and the record certainly does not support the contention that at the time Hollywood was aware which of her attendance points weren't for her medical condition at that time. She missed... She claims the record states, the district court's order states that 5.5 attendance points were due to asthma condition whereas the remainder what I would get at is by February of the next year didn't they know that she hadn't as the EEOC counsel just pointed out they would have had a pretty good pattern by then of seeing what her... She had only missed a few days. It wasn't like she was missing two weeks at a time or three weeks at a time. Well, no, but she had missed enough days in total to point out in the attendance policy in fewer than seven months whether she had an asthma condition or not, I don't know. We also don't know that had the request been granted how she would have actually acted upon that request whether she would have missed more days or not. And at the end of the day we simply had no way of knowing anything about it. The request on its face was unreasonable because it was for unlimitedly also... I knew that I only wanted this accommodation for five months until I qualified for FMLA. So I would entirely dispute that. She never conveyed that at the time of her request. She inquired at the time of her... It was like during orientation, during onboarding about whether or not FMLA was something that Hollywood offered. Now, I don't believe that that can be inferred then several months later assuming that her request was only until she received FMLA. But also, I'd like to point out that the precedent of this circuit doesn't really support the notion that a request until I receive FMLA is a reasonable durational limit. There's a footnote... There's a footnote to that effect in Danzey, but it states it without any discussion. It just says, oh, Danzey requested leave until he receives FMLA. But if you look at Herman, you can't make a durational limit of your request. You have to have the durational limit of the impairment so that the employer can consider whether the accommodation request would actually allow the employee to perform the essential functions of the position. At the end of the day, this case really does boil down to the fact that attendance is an essential function of this position, and her request did not allow her to request leave upon leave and maybe a leave that leads to another leave. But when you come back, you may or may not be able to perform the essential functions of the position, and that is not consistent with the law of this circuit or any other circuit. And I believe the EEOC has taken that position to push the boundaries of what is required under the ADA for leave in terms of intermittent leave because there would be no eligibility requirements, there would be no hourly limitations, there would be no turnover clock every 12 months to determine whether or not you've worked enough hours. It would just impose upon employers a requirement to grant essentially any leave request because when that leave expired, you might be able to perform the essential functions of the position. And so what that does is it negates the idea that the EEOC has many times recognized, you know, recently in UNRINE, authored by you, Judge Chipkovich, we recognize that regular and reliable attendance at work and presence at work is an essential function of almost every position. And that is very much the case here where we relied upon Ms. Davis and those in her position to be present on the floor, and when she calls in at the last moment and says, and so, sorry. I want to take you to another topic which is the interactive process. I believe Ms. Davis is arguing that Hollywood did not engage in the interactive process or that it dropped the ball at some point during the process. What's your response to that? Well, my first response to that is that if you don't state a plausibly reasonable request for Ms. Davis to be required to participate in the interactive process, I would actually argue that we did participate in the interactive process extensively, that we had numerous conversations with Ms. Davis and then made multitudinous attempts to contact her healthcare provider, but those are issues that could be disputed as fact issues. So I would point to the legal issue and say that we are not legally required to engage in the interactive process because she did not state a plausibly reasonable request for accommodation. And under that circumstance, the employer is not required to. And also, a failure to engage in the interactive process is not itself an independent basis for liability under the ADA. That's been stated many times in the cases of the circuit. I probably have a bunch of them tapped, but I will just point out that we then would still have to look at whether a reasonable accommodation existed, whether she was a qualified individual, whether she had fails on those tests regardless of the interactive process piece. But again, I would state that we engaged in extensive interactive process over the course of several months. These are very difficult issues for ground-level, employee-level human resources professionals to deal with, as can be evidenced by the vast body of case law where we debate this minutia. So we're requiring human resources specialists to look at these requests and look at the needs of the company and determine whether or not this is a reasonable request. And that is very difficult. And Ms. Beck, in this case, engaged in extensive efforts with Ms. Davis and with Ms. Davis's physician's office because her physician wouldn't actually participate in an attempt to answer that question. And ultimately, we discovered that Ms. Davis's physician wouldn't engage in that process because he did not believe that she had a disability. And as I understand it, that caused her to then subsequently change physicians, at which point her condition improved somewhat. However, at the time, again, all we can do is rely upon what's provided to us from the physician and what the actual body of the request is. Did you argue that she didn't have a disability at any point? We didn't. As far as I'm concerned, that was not in our position. We never took that position. We accepted that she had the asthma condition because the paperwork that was provided from her, the documentation from her physician, stated that she had this condition. It's only in Ms. Davis's testimony where she informed us that later her physician informed her that he did not believe she was disabled. That was not in any way a consideration. I guess I'm wondering why you mention it. What does it have to do with any of the issues in this case? Because it explains why her physician would not cooperate with our attempts to resolve this matter more quickly. We could have addressed these issues within the first days of the request, perhaps, if he had participated. But instead, the undisputed record will show, the uncontroverted record will show, that there were numerous attempts to contact his office. We were constantly told to, OK, we can't answer questions over the phone, fax them to us. So we faxed them to us. And then we called again, and they said, fax them to us again. And we faxed them to them again. And there was never any response. And then it was only at deposition that we asked Ms. Davis whether there was any subsequent discussion of that process with her physician. So that was not something that weighed into our decision. It's simply an explanation relevant to the question of interactive process. Under Herman, didn't we suggest for a chronic condition there, that leave would be an appropriate accommodation? Why doesn't that apply here? Well, there were several distinctions between Herman. For one thing, Herman dealt with a definite and finite request for leave. It dealt with a known duration. And there's an extensive discussion in Herman regarding, as I mentioned before, the need to know the duration of the impairment and the intended therapeutic schedule to know whether or not the employee is going to be able to return to work and perform their essential functions. And so, in Herman, we suggested, yes, as cases have for decades, that leave may, in some circumstances, be a reasonable accommodation. Nobody disputes that. However, that doesn't mean that every request for leave is reasonable or that every type of leave is reasonable. And then there is a subsequent body of case law saying that unlimited requests for leave are not reasonable. In fact, Herman specifically says, let me see if I can lay it quickly at hand. But a request for indefinite leave is not reasonable as a matter of law. For a leave request to be reasonable, an employee must provide an expected duration of the impairment, not the duration of the leave request. This is because reasonable accommodation refers to those accommodations which presently or in the near future enable the employee to perform the essential functions of his job. And without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future. Carrying on, Herman provided evidence of the expected duration of her impairment and then goes on to explain why that applied in Herman. That would not apply to this case. Why not? Why wouldn't the duration of the, anticipated duration of the impairment be up to 21 days per attack? Because her request was forever. Her requested accommodation was not 21 days. It was forever. In fact, the date noted Was it forever or was it as needed? I mean, essentially as, I mean. Yes, forever as needed. No duration. Durationally forever. It's not a duration. Not necessarily forever. Yes, durationally forever. Forever. She says until she was going to receive FMLA, I would say that's highly speculative. Everything closed down one month after her separation and all employees were furloughed and employees of her seniority were actually terminated in August of that year. There never would have been FMLA. Regardless, duration was, was forever. And, and. Well, you know, duration was for five months as needed. You, you're trying to use hindsight to say, well, no, because she would have been terminated because of COVID. But, at the time she's requesting it, her position is for five months until I meet the one-year deadline for FMLA, I want accommodation as needed periodically during that finite five-month period. Well, I first would point out that it wasn't five months at the time of the request. At the time of the request, it was about nine months. So, that was October. She wouldn't have achieved FMLA eligibility as soon as she met, she met all the other eligibility requirements that would have been in the end of July. So, so that would be the first part. And the second part is she never conveyed to us that she intended it to last until she received FMLA leave. Again, her request was as needed for asthma and allergies. There was no duration. Is there any, on the reasonable accommodation piece, do we need to drill down, or maybe it's a fact question, look at whether this particular request would be a hardship on the company? In other words, that you have, you know, enough standby staff or differently trained staff that can substitute for her absences? I certainly believe that the hardship analysis and the essential function analysis and the facts supporting those in this case broadly overlap. And the uncontroverted evidence in this case is that the failure of a table games dealer to show up at work is a significant burden and hardship on the company. Not only on the co-workers, but on the fact that you simply can't staff enough tables. And if you don't staff enough  then you don't have enough customers, and your customers will be inclined not to return to your casino. Because this is, again, on a, you know, the company actually has their own table during their shift. So that's one fewer table that you have available at that time. And as the district court noted, that may not be the same level of dire circumstance as the NICU nurse is in the Samper case in the Ninth Circuit. But to that employer, that's still essential, and it's still an issue. Thank you very much. We appreciate the